# 25-664-cr(L), 25-1541-cr(CON)

# United States Court of Appeals
*for the*
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

ROBERT DYCKMAN,

*Defendant,*

GLENN GRIFFIN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT GLENN GRIFFIN

JEFFREY C. HOFFMAN
MARKY A. SUAZO
GABRIEL ALTMAN
WINDELS MARX LANE & MITTENDORF, LLP
*Attorneys for Defendant-Appellant*
156 West 56th Street
New York, New York 10019
(212) 237-1000

COUNSEL PRESS (800) 4-APPEAL • (391814)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 1

I. Griffin's Challenges to the Plea Agreement, the Guilty Plea Proceeding and his Guilty Plea are not Barred By the Appellate Waiver Provision ........ 1

A. Griffin's Plea was Not Knowing and Voluntary ........ 2

B. Counsel Used the §1028A Charge as Leverage to Force a Plea Without Investigating Its Viability ........ 8

II. The Plea Allocution Failed to Establish an Adequate Factual Basis After Griffin Denied Illegality ........ 13

A. McCarthy's Conduct Tainted the Plea Allocution ........ 13

B. Rule 11 Was Not Satisfied Given Griffin's Denials of Key Elements ........ 17

C. The Government's Remaining Authorities Do Not Apply Where the Defendant Denies *Mens Rea* ........ 20

III. Griffin Preserved His Loss-Amount Challenge and Was Denied the Opportunity to Develop the Record ........ 23

A. The Government Erroneously Presumes the Loss Amount Was Uncontested ........ 25

B. The District Court Adopted Loss Estimates Without Resolving Disputed Issues of Fact Concerning Causation ........ 28

CONCLUSION ........ 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bridges v. United States*,
991 F.3d 793 (7th Cir. 2021) .......... 9, 10

*Dubin v. United States*,
599 U.S. 110 (2023) .......... 9, 10

*Godwin v. U.S.*,
687 F.2d 585 (2d Cir. 1982) .......... 21

*Griffin v. United States*,
405 F.2d 1378 (D.C. Cir. 1968) .......... 22

*Heiser v. Ryan*,
951 F.2d 559 (3d Cir. 1991) .......... 5, 6

*United States ex rel. Dunn v. Casscles*,
494 F.2d 397 (2d Cir. 1974) .......... 16, 21

*United States v. Adams*,
448 F.3d 492 (2d Cir. 2006) .......... 2

*United States v. Andrades*,
169 F.3d 131 (2d Cir. 1999) .......... 17, 18

*United States v. Arevalo*,
628 F.3d 93 (2d Cir. 2010) .......... 1

*United States v. Aybar-Peguero*,
72 F.4th 478 (2d Cir. 2023) .......... 21, 22, 23

*United States v. Bell*,
22 F.3d 274 (11th Cir. 1994) .......... 12

*United States v. Cuomo*,
125 F.4th 354 (2d Cir. 2025) .......... 10, 11

*United States v. DeSilva*,
613 F.3d 352 (2d Cir. 2010) .......... 24

*United States v. Garcia*,
587 F.3d 509 (2d Cir. 2009) .......... 15, 16

*United States v. Glum*,
272 F. App'x 124 (2d Cir. 2008) .......... 25, 26, 27

*United States v. Granik*,
386 F.3d 404 (2d Cir. 2004) .......... 27

*United States v. Hilton*,
701 F.3d 959 (4th Cir. 2012) .......... 11, 12

*United States v. Lloyd*,
901 F.3d 111 (2d Cir. 2018) .......... 3, 4

*United States v. Maciel-Alcala*,
612 F.3d 1092 (9th Cir. 2010) .......... 11

*United States v. Maher*,
108 F.3d 1513 (2d Cir. 1997) .......... 18

*United States v. McCoy*,
895 F.3d 358 (4th Cir. 2018) .......... 2

*United States v. Navedo*,
516 F.2d 293 (2d Cir. 1975) .......... 17

*United States v. Pattee*,
820 F.3d 496 (2d Cir. 2016) .......... 14, 16

*United States v. Pergola*,
2025 WL 842789 (2d Cir. 2025) .......... 2

*United States v. Puentes-Hurtado*,
794 F.3d 1278 (11th Cir. 2015) .......... 2

*United States v. Robinson*,
799 F.3d 196 (2d Cir. 2015) .......... 20

*Uresti v. Lynaugh*,
821 F.2d 1099 (5th Cir. 1987) .......... 4, 5

**Statutes & Other Authorities:**

18 U.S.C. § 1028A .......... *passim*

18 U.S.C. § 1028A(a)(1) .......... 9

U.S.S.G. § 2B1.1 .......... 29

U.S.S.G. § 6B1.4(a)(2) .......... 25

## PRELIMINARY STATEMENT

This Reply is respectfully submitted in response to the Government's Brief in Opposition (cited herein as the "Opp."). Appellant stands on the arguments in his main brief, but also responds more specifically to certain of the Government's claims.

## ARGUMENT

### I. Griffin's Challenges to the Plea Agreement, the Guilty Plea Proceeding and his Guilty Plea are not Barred By the Appellate Waiver Provision

It is settled law that an appellate waiver in a plea agreement is inapplicable to and does not bar a claim that a guilty plea was not knowing and voluntary, just as it does not bar a claim of ineffective assistance of counsel.[1] A defendant cannot waive a right if he did not know he was waiving it or if he did not do so voluntarily.

The Government concedes that Griffin's challenges to the voluntariness of his Guilty Plea and the effectiveness of his counsel are not barred by the Plea Agreement. (Opp. at 28, n. 7). *See also United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010) ("we find waivers unenforceable only in very limited situations, 'such as when the waiver was not made knowingly, voluntarily, and competently'") (citation omitted).

[1] Here, the Plea Agreement explicitly noted that Griffin reserved his rights to "assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise." (A-698).

The Government appears to argue, however, that the Plea Agreement bars Griffin's challenge to the factual basis for his Plea, because the Magistrate explained the appellate waiver to him and he stated that he read it and discussed it with counsel. (Opp. at 30). Second Circuit law, as well as that of several other Circuits, holds the opposite. As recently as last year, this Court reiterated its prior precedent that an appellate waiver does not preclude challenges to the conduct of the plea proceeding because "'[a] lack of a factual basis for a plea is a defect' so fundamental as to cast serious doubt on the voluntariness of the plea." *United States v. Pergola*, 2025 WL 842789 (2d Cir. 2025) (citations omitted); *see also United States v. Adams*, 448 F.3d 492, 497 (2d Cir. 2006); *United States v. Puentes-Hurtado*, 794 F.3d 1278 (11th Cir.2015); *United States v. McCoy*, 895 F.3d 358, 364 (4th Cir. 2018). This, too, is settled law.

**A. Griffin's Plea was Not Knowing and Voluntary**

The Government tries to downplay McCarthy's conduct by arguing that a lawyer's pessimistic view of a case does not render a plea involuntary. (Opp. at 33-34). However, Griffin's challenge to the voluntariness of his claim does not rest on McCarthy's pessimistic advice. His advice was more high-pressured than that; it was more along the lines of fatalistic. McCarthy categorically and emphatically refused to try the case and threatened that Griffin would need a new attorney if he insisted on exercising his right to trial. It was not as if McCarthy had been circumspect about

the case from the beginning; at an earlier stage of the case, McCarthy repeatedly assured Griffin and other interested parties that he would not go to jail ("not on my watch"), a turnaround that caused Griffin a good deal of cognitive dissonance. (*See* A598:2-7; A-247-272).

In *United States v. Lloyd*, 901 F.3d 111 (2d Cir. 2018), a case in which the Government seeks support where there is none (Opp. at 30), this Court affirmed indisputable Second Circuit precedent that, "if we are not assured that a defendant's plea was voluntary and knowing, we will not enforce any waivers provided in the related plea agreement." The *Lloyd* Court stated the proposition even more broadly: "courts have 'adopted a standard of strict adherence to Rule 11, and examine critically even slight procedural deficiencies to ensure that the defendant's guilty plea was a voluntary and intelligent choice . . . ." *Id*. at 119 (citation omitted). This Court affirmed in *Lloyd* because the error was not preserved and it applied the onerous plain error standard. *See generally id*. Griffin, however, reserved his challenge by moving to withdraw his plea before sentencing and he demonstrated not only that the plea proceedings contained procedural deficiencies, but that his guilty plea was not knowing and voluntary.

*Lloyd* also recognized that an ineffective assistance claim affecting the plea would render both the plea involuntary and the waiver unenforceable. *Id*. at 124-25. The *Lloyd* Court declined to resolve an ineffective assistance claim because the

record was undeveloped. *Id*. at 125. In Griffin's case, the record amply demonstrates that McCarthy went so far as to step into the judge's shoes, allocuting his own client, and literally putting words into his client's mouth. In contrast, the record in *Lloyd* was "devoid of testimony or other evidence from *Lloyd's* prior counsel." *Id.* at 124.

Here, the District Court conducted an evidentiary hearing, Griffin's then-counsel (McCarthy) testified under oath, documentary evidence was introduced, and the court made findings. Griffin's ineffective-assistance claim is therefore fully developed for meaningful appellate review. Under *Lloyd's* framework, the Court must determine, unencumbered by the appellate waiver provision, whether counsel's conduct rendered the plea involuntary.

In both *Lloyd* and another case cited by the Government, *Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir. 1987), the Court employed a different and more difficult standard than Griffin faces: plain error in *Lloyd* and the equally onerous *Strickland* standard that applies when the voluntariness of a plea is raised in a collateral proceeding. Uresti's lawyer told his client "that if he did not accept the recommended thirty-five (35) year plea [bargained down from 60] on that day he, the attorney, would request permission of the Court to permit him to withdraw as his attorney and ask the court to appoint someone else. . . ." *Id.* at 1101. Of particular significance to the *Uresti* Court was that Uresti's lawyer did not "threaten abandonment," but he said he would ask to be relieved "so that another attorney

more sympathetic to trial be appointed in his stead." And, the *Uresti* Court did not find "any other indication that counsel's representation was inadequate." *Id.* at 1102. Those two factors are salient in Griffin's case.

McCarthy *did* threaten abandonment; he told Griffin he would have to find another lawyer (he did not offer to help). Finding a private lawyer willing to take a case that is at the plead or trial stage would not be easy. It certainly is not as seamless as asking the judge to appoint another lawyer. Among the indications that McCarthy's representation fell short is his failure to know or research the law about aggravated identity theft, especially a recent, game-changing Supreme Court case. (*See infra.* I(B)).

The Third Circuit was not as sympathetic as the *Uresti* Court to a lawyer who believes his representation can be conditioned on what the lawyer believes the outcome should be, regardless of the constitutional rights involved. Supporting Griffin's position, the Court in *Heiser v. Ryan*, 951 F.2d 559, 562 (3rd Cir. 1991), stated categorically that:

> A defendant faced with a critical decision of such dire consequences as a plea of guilty will assuredly rely heavily upon advice of counsel. We hold that if Heiser's **trial** counsel **threatened** to **withdraw** from the **case** unless Heiser **pleaded guilty**, then his plea is involuntary, and he has met his burden on the first *Zettlemoyer* step.[2]

[2] On a habeas petition, the first step is to decide whether Petitioner's allegations, if true, would entitle him to relief, and, if so, the Court must determine whether the Petitioner is entitled to an evidentiary hearing to prove those allegations. *Heiser*, 951

(emphasis added). The *Heiser* Court remanded for an evidentiary hearing in this post-conviction proceeding appeal. It is indisputable that McCarthy threatened to withdraw from his representation of Griffin; he said as much, unequivocally, in his testimony. That fact having been established, as well as the coercive nature of his then-counsel's conduct, Griffin is entitled to a remand to withdraw his Plea.

Griffin argues that the Plea was the product of coercion by counsel, which the record supports. The record developed during the Motion to Withdraw shows that Griffin's attorney repeatedly told him that trial was not an option and that he would refuse to try the case. McCarthy testified that when Griffin talked about going to trial, he responded that he "will not do it; it's a loser." (A-472:4-5, A-536:13-15).

McCarthy's threats were reinforced by dire predictions of certain imprisonment. McCarthy told Griffin: "If you go to trial, you're going to lose, you're going to go to federal prison. You have to negotiate this down and we have to plead guilty." (A-406:15-18). He described conviction as inevitable, declaring the case unwinnable "100 times out of 100." (A-395:5-6). Both the lower court and the Government claimed that McCarthy was presenting Griffin with the sober realities inherent in any criminal case. (Opp. at 33; SPA-27). However, McCarthy's coercive statements cannot be viewed in isolation, and taken together with other deficiencies

F.2d at 562. In Griffin's case, he has proven the allegation that his attorney threatened to withdraw if he did not plead guilty.

in his representation of Griffin, rendered Griffin's plea involuntary. McCarthy's threat that Griffin would have to find a new lawyer if he decided to go to trial went beyond presenting "sober" realities. (Opp. at 36). It was a threat to abrogate his role of protecting his client's constitutional rights.

Not only did McCarthy make this statement to Griffin directly, but he announced it in open court at a conference in April 2024, when McCarthy stated that "it's not my intention ever to try this case." (A-65:18-21). By publicly declaring that he would never take the case to trial, McCarthy effectively, without any proper purpose or benefit to his client, sabotaged the leverage available to criminal defendants during plea negotiations – the possibility that the Government might be forced to expend its resources and prove its case to a jury.

The District Court itself recognized that the opposite approach is fundamental to effective criminal defense practice. The court described "defense lawyering 101" as persuading the Government that "they might lose," a principle McCarthy acknowledged under oath (A-431:2-6), yet completely violated. By repeatedly telling his client that trial was impossible, refusing to try the case, and informing the Government that he never intended to go to trial, McCarthy removed Griffin's ability to exercise the very right, his right to trial, that goes hand in hand with the Sixth Amendment right to be represented by counsel.

Nothing resembling this record existed in any of the cases cited by the Government. The record in Griffin's case includes sworn testimony from his then-counsel that if Griffin insisted on going to trial, he would need to find another attorney, because the case was an "absolute loser." (A-390:1-9, A-409:21-A-411:3, A-537:11-19). That is not a neutral disclosure about possible substitution of counsel. It is a threat that effectively conditioned Griffin's right to trial on securing new representation, and left Griffin without any meaningful option but to plead guilty.

Accordingly, McCarthy's conduct rendered Griffin's guilty plea involuntary, obviated the appellate waiver, and established a basis for vacating Griffin's conviction. The District Court erred by denying Griffin's motion to withdraw his guilty plea.

### B. Counsel Used the §1028A Charge as Leverage to Force a Plea Without Investigating Its Viability

McCarthy maximized the fear factor of a mandatory consecutive two-year prison sentence attendant to conviction for aggravated identity theft (18 U.S.C. §1028A). McCarthy portrayed that sentence as an inevitable consequence if Griffin went to trial, even though counsel did no legal research and therefore failed to discover recent Supreme Court precedent, which would have influenced his client's decision-making process. The Government has been chastised by no less than the

Supreme Court for overfitting the statute to a wide array of conduct. *See, e.g., Dubin v. United States,* 599 U.S. 110, 131 (2023) (citation omitted):

> Finally, the Government makes a familiar plea: There is no reason to mistrust its sweeping reading, because prosecutors will act responsibly. To this, the Court gives a just-as-familiar response: We "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly. . . . This concern is particularly salient here. If § 1028A(a)(1) applies virtually automatically to a swath of predicate offenses, the prosecutor can hold the threat of charging an additional 2-year mandatory prison sentence over the head of any defendant who is considering going to trial.

While urging his client to plead guilty to avoid the jail sentence that was certain to flow from a conviction for the aggravated identity theft charge, McCarthy did not investigate the legal and factual viability of the charge before using it to strongarm Griffin into pleading guilty. McCarthy admitted that he never examined the "evolving" legal standards governing §1028A, nor was he aware of the Supreme Court's opinion in *Dubin,* issued more than a year before Griffin pled guilty. When asked about the issue, he testified: "I didn't go into the evolving legal nature . . ." and "I did not go into that, because I felt that, if they're not going to agree to come off it, I've got a real problem." (A-430:14-19). He further conceded: "We really didn't go down that road much, no." (A-432:3-4). *See Bridges v. United States,* 991 F.3d 793,801 (7th Cir. 2021) (counsel ineffective where "the building blocks for a

successful legal argument were already in place," and "minimal research would have uncovered a Tenth Circuit decision").

McCarthy repeatedly invoked the mandatory sentence attached to §1028A as a reason Griffin had no realistic choice but to plead guilty, and to extol the virtues of the Government's plea offer excluding that charge. However, basic legal research would have shown that the statute does not automatically apply whenever identifying information appears in connection with a transaction, and that liability depends on whether the use of another person's identity lies at the "crux" of the alleged fraud. *See Dubin*, 599 U.S. at 131. In short, McCarthy did not even have to "anticipate arguments foreshadowed but not yet adopted by existing case law[.]" *Bridges*, 991 F.3d at 803. The Supreme Court had already laid the path to a meritorious defense before him.

The Government's reliance on *United States v. Cuomo*, 125 F.4th 354 (2d Cir. 2025), is misplaced. *Cuomo* involved a scheme built on impersonating real debtors using their Social Security numbers so that state agencies would mistake the perpetrators for those individuals. *Id.* at 369. The *Cuomo* court emphasized that "the entire process was about impersonating debtors," a tell-tale indication that a "person's identity" resided at the "crux" of the criminal conduct. *Id.*

The conduct here is materially different. Griffin's case concerns sham bids submitted on corporate documents on behalf of corporate entities that occasionally

included a name or telephone number purporting to belong to the business contact listed. The scheme did not depend on impersonating *any* particular individual, nor did it require the victim to believe that a specific person was involved. In fact, because of the lower-dollar value nature of the jobs, three bids were needed to satisfy the municipal procurement requirement and the lowest bidder would win (in this case, Griffin's entities). (A-109). However, unlike in *Cuomo*, the alleged fraud did not turn on deceiving the victim about "who" was involved in the transaction, and the only material identity used was that of a corporation, not an individual "person" as the statute requires.[3] *See e.g., United States v. Hilton*, 701 F.3d 959, 969 (4th Cir. 2012) ("We conclude that the identity theft statutes are fatally ambiguous regarding whether they include as a criminal offense the unauthorized use of the means of identification of a corporation."). McCarthy never examined the issue of whether the

---

3 The Ninth Circuit examined the legislative history of 18 U.S.C. § 1028A and cited the bill's co-sponsor, who explained the statute's choice of language as follows:

> In section A where the offenses are defined, it refers to a means of identification of another person. I take it by the choice of that language that these enhancements apply when the fraudulent identification is that of another existing person, either live or deceased, but an actual individual, so in the case of a garden-variety immigration case where somebody fabricates an identity card out of whole cloth, not referring to any other person but merely invents a persona, that that would not be included within the sweep of this.

*United States v. Maciel-Alcala*, 612 F.3d 1092, 1100 (9th Cir. 2010).

alleged "victim" (*i.e.* a purported bidding corporate entity) could even be a victim for purposes of §1028A, which *Hilton* casts considerable doubt upon.[4]

McCarthy nevertheless portrayed the §1028A charge as an inevitable source of additional imprisonment and used it to pressure Griffin into pleading guilty. Because McCarthy admitted that he never investigated whether the statute applied, Griffin's Plea cannot be considered the product of a fully informed and voluntary decision. Although Griffin ultimately did not plead guilty to the charge, fearing the consequences of an aggravated identity theft conviction clearly entered into his evaluation of the risk of going to trial. The lower court erred by failing to consider that McCarthy's misrepresentations or omissions about the legal and factual footing of the charge played a pivotal role in Griffin's ultimate Plea. *See, e.g., United States v. Bell*, 22 F.3d 274, 276 (11th Cir. 1994) (vacating plea and remanding because court found that defendant's "argument that several counts of the indictment fail to charge an offense, if meritorious, constitutes a 'fair and just reason' for withdrawal of his guilty plea"). The Government notes that McCarthy told Griffin the bid-rigging charge was triable. (A-401:8-12, A-436:1-19). Had McCarthy had a competent understanding of the law of aggravated identity theft, or done any research, he would have said the same about aggravated identity theft, and he would

[4] Since this is a legal issue, it would have been appropriate to raise in a pretrial motion, potentially changing this case's posture. McCarthy, however, made no motions at all. (A-351).

not have been able to use its mandatory consecutive sentence to bludgeon a plea out of his client.

The lower court erred by discounting McCarthy's inaccurate advice regarding the strength of the aggravated identity charge to coax his client into accepting a plea he never wished to enter.

## II. The Plea Allocution Failed to Establish an Adequate Factual Basis After Griffin Denied Illegality

According to the Government, Griffin's Plea was supported by an adequate factual basis because Griffin ultimately answered "yes" to a series of leading questions posed, not by the judge, but by defense counsel, who was more concerned with extracting a guilty plea out of his client than ensuring the process comported with Rule 11. (Opp. at 41-46). Defense counsel's role at a plea proceeding is usually to make sure his client understands the questions and answers them accurately. Here, his role was to prevent his client from deviating from a one-word answer: "yes." The Government overlooks the central problem with the plea allocution: Griffin initially denied that he did anything illegal. (A-159:19-25). He was only brought around by the overstepping efforts of his lawyer.

### A. McCarthy's Conduct Tainted the Plea Allocution

The Government argues that Griffin's allocution complied with Rule 11, but the Government's legal support does not apply to circumstances, such as here, where a defendant denies elements of the crimes to which he was pleading and receives

ineffective assistance of counsel. For example, *United States v. Pattee*, 820 F.3d 496 (2d Cir. 2016), reinforces Griffin's position that "incanting rights and eliciting affirmative answers as required by the Rule goes only so far;" courts must go "beyond rote recitals" to ensure that a defendant's plea is knowing and voluntary. *Id.* at 504.

In *Pattee*, this Court explained that Rule 11's enumerated requirements serve only as a baseline and "a trigger to seek out additional issues relevant to the particular defendant," especially when a defendant's statements raise doubts about his mental state, understanding, or voluntariness, as occurred here. *Id*. at 504. During the initial phase of the Plea Hearing, Griffin disputed the Government's account of the alleged conspiracy and stated that "there was never anything illegal about it," prompting the court to halt the proceeding. (A-158-A-160:3). Rather than probing that contradiction to determine whether Griffin could actually admit to the elements of the offense he was allocating to, the post-recess colloquy consisted largely of leading questions posed by McCarthy to Griffin, eliciting one-word affirmations under protest after Griffin indicated he was acquiescing to "make [the allocution] easier on everybody." (A-160 at 36:11-12). Griffin's perfunctory answers to questioning that followed is exactly the type of procedure *Pattee* warned courts to avoid. *See Pattee*, 820 F.3d at 504 ("Because even strict adherence to Rule 11 may not cover every issue that may be relevant to assessing a particular defendant's understanding,

district and magistrate judges must be alert to ways to go beyond rote recitals, in order to make sure that the defendant's waiver of rights is truly knowing and voluntary.").

At the Motion to Withdraw Hearing, the District Court acknowledged the deficiencies in Griffin's allocution. Reviewing Griffin's statements before Judge Reznik at the Plea Hearing, Judge Briccetti observed that Griffin's account of his conduct was "not fully compliant with the elements of the offense" and stated plainly: "You equivocated. You did equivocate. That is for sure. No question about that." (A-601:12-14; A-602:10-11).

The post-recess colloquy conducted was designed for McCarthy to extract the answers Judge Reznik identified as missing, not to ensure that Griffin genuinely and voluntarily admitted the elements of the offenses. Having acknowledged that the allocution fell short of establishing Griffin's guilt, the District Court erred in finding that the scripted yes/no questions and answers that followed cured those deficiencies. Controlling Second Circuit authority confirms that it did not.

Where a defendant's allocution reflects active confusion about or denial of an essential element, the record must contain something that renders the defendant's innocent account unworthy of belief before a plea may be accepted. *See United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009) (vacating guilty plea where defendant admitted underlying conduct but actively denied the concealment element of money

laundering, holding that defendant's "allocution demonstrated actual confusion about the concealment element of the offense" and that "when an essential element is factually disputed, some circumstances must appear on the record to warrant a conclusion that the defendant's innocent version is unworthy of belief").

The same deficiencies in *Garcia* are present here. Griffin admitted to dumping and to payments, but consistently denied their criminal character. The scripted post-recess questioning did not resolve that contradiction or establish that his innocent account was unworthy of belief. (A-159:19-27). The District Court acknowledged Griffin's equivocal answers and his denial of illegality, yet upheld the plea without resolving that contradiction. (A-601:12-14; A-602:10-11). According to controlling authority, this was an error requiring vacatur and remand. *See United States ex rel. Dunn v. Casscles*, 494 F.2d 397, 400 (2d Cir. 1974) (vacating guilty plea where defendant alternated between admissions and denials and the trial court failed to resolve that contradiction, holding that a plea cannot stand where "affirmative general statements that he did commit the crime were also offset by negative statements that he did not").

The Government's own caselaw corroborates that the need for meaningful inquiry to satisfy Rule 11 arises when, as here, a defendant exhibits a mental state of considerable doubt, bearing upon the voluntariness of the plea. *See Pattee*, 820 F.3d at 504 (cited by Opp. at 41). Here, those doubts were unmistakable. Griffin initially

denied that his conduct was illegal, yet the subsequent questioning did not meaningfully explore that denial or ensure that Griffin personally admitted key elements of the offenses. (A-159:19-27). Therefore, the District Court erred by accepting Griffin's guilty plea.

### B. Rule 11 Was Not Satisfied Given Griffin's Denials of Key Elements

The Government's Rule 11 argument rests largely on decisions that it reads as endorsing acceptance of guilty pleas despite limited allocutions. However, this Court has made clear that where the plea record fails to demonstrate a defendant's understanding of the charge and an adequate factual basis, vacatur follows. *See United States v. Navedo*, 516 F.2d 293, 298 (2d Cir. 1975) (affirming district court's rejection of guilty plea).

The Government's reliance on *United States v. Andrades*, 169 F.3d 131 (2d Cir. 1999), is misplaced. (Opp. at 45). Although the *Andrades* court noted that Rule 11 did not mandate a particular formula of dialogue, the Second Circuit ultimately vacated the defendant's guilty plea because the record failed to establish both that the defendant understood the nature of the conspiracy charge and that a factual basis existed at the time the plea was entered. *Id.* at 134-36. The *Andrades* Court explained that Rule 11 requires the district court to determine "by some means that the defendant actually understands the nature of the charges" and to ensure that facts placed on the record demonstrate that the defendant's admitted conduct constitutes

the offense charged. *Id.* at 135 (quoting *United States v. Maher*, 108 F.3d 1513, 1521, 1524 (2d Cir. 1997)). Because the district court in *Andrades* merely read the charge and elicited a "yes, sir" response without establishing that the defendant understood the elements of conspiracy or admitted facts supporting them, the plea was vacated. *Id*. at 133.

The same deficiencies that this Court identified in *Andrades* are present here. As argued in Griffin's main brief, the allocution initially revealed his confusion and a firm denial of illegality, including Griffin's statement that "there was never anything illegal about it." (A-159:19-25). Rather than resolving that contradiction or ensuring that Griffin could personally admit the elements of conspiracy, the post-recess colloquy consisted largely of leading questions eliciting one-word affirmations. While no "specific dialogue" is required (*see* Opp. at 45), Griffin's allocution does not satisfy Rule 11 since the record creates considerable uncertainty about whether he understood the charge or admitted conduct constituting the offense. *Andrades*, 169 F.3d at 134-36. *Andrades* confirms that where the plea record fails to demonstrate a defendant's clear understanding of the charge and a factual basis for the plea at the time it is entered, the plea must be vacated.

The evidentiary hearing record confirms what the allocution record already established: Griffin's one-word affirmations reflected neither comprehension nor a genuine admission of guilt. Testifying under oath months later, Griffin described the

same mental state he exhibited before the Magistrate: "I was not comprehending what was being said. I was confused. I was scared. And I was -- I don't even know what the word is. I was just -- I wasn't listening. I wasn't hearing what was said." (A-583:8-11). He explained that the yes/no answers the Government now points to were the product of direct instruction from the attorney who had spent months pressuring him to plead guilty: "As my attorney, he told me to say yes, and I was scared and I did not know what to do. All I know was he said answer everything. Answer all the questions and just get through this." (A-594:2-5). Griffin testified that "Stephen whispered in my ear, you either say yes to everything or you're going to jail." (A-601:3-4).

Critically, Griffin's allocution concerning the substantive position on the charges remained unchanged. Under oath at the evidentiary hearing, he maintained that the text messages referenced in the Indictment did not establish bribery or bid-rigging (A-609:19-23), and that he was not responsible "for one iota" of the environmental damage observed by the Westchester Land Trust. (A-607:12-14). When he attempted to say as much before Judge Reznik, he testified, "I got shut down." (A-600:25). The consistency between Griffin's statements at the Plea Hearing and his sworn testimony at the Motion to Withdraw Hearing establishes that

the post-recess affirmations were never a genuine admission of guilt, that the allocution's deficiencies were never cured, and that the Plea cannot stand.

### C. The Government's Remaining Authorities Do Not Apply Where the Defendant Denies *Mens Rea*

Nothing in the Government's opposition undermines Griffin's testimony about his state of mind during the Plea Hearing. The Government's cited authority does not cure the District Court's reversible error.

For example, *United States v. Robinson*, 799 F.3d 196 (2d Cir. 2015) (cited by Opp. at 43), permits courts to rely on proffers and other evidence when determining whether a factual basis exists. But reliance on a proffer presumes that the defendant adopts it. Here, Griffin did not. He unequivocally disputed the Government's narrative before the recess. (*See* A-159:19-25 ("No. There was never anything illegal about it . . .")). With respect to Count Two, his statements that he was simply "asking people to put in some bids . . ." did not establish an agreement to commit a crime or shared intent to defraud, nor did it speak to the ultimate scheme to defraud underlying Count Two of the Superseding Information, which specifically involved a Conspiracy to Commit Wire Fraud in connection with forged bids. (*Compare* A-159:4-5 *with* A-112-13 at ¶¶5-6). Moreover, with respect to Count Two, Griffin expressly stated "it wasn't as detailed as Mr. Felton expressed." (A-159:7-8). These statements directly contradicted the factual basis necessary to sustain conspiracy convictions under Counts One and Two, and the Government's

own authority supports vacatur. *See, e.g., Godwin v. U.S.*, 687 F.2d 585, 589 (2d Cir. 1982) (vacating conviction where "the defendant's assertion of facts indicating an innocent state of mind required precise explanation of additional aspects of the intent necessary for conviction") (Opp. at 43).

Equally ineffective is the Government's citation to *United States ex rel. Dunn v. Casscles*, 494 F.2d 397 (2d Cir. 1974), which stands for the unremarkable proposition that inconsistencies alone do not invalidate a plea. (Opp. at 43). However, the *Dunn* court clarified that this principle applies only when an independent factual basis exists for the plea. *Id.* at 400. The court vacated the plea in *Dunn* because the defendant alternated between admissions and denials and the trial court failed to resolve that contradiction. *Id*. The same problem exists here. Griffin denied illegality and the District Court halted the proceeding because he had not admitted acting knowingly and willfully, and his "affirmative general statements that he did commit the crime were also offset by negative statements that he did not." *Id*. at 400. The post-recess allocution did not resolve that contradiction. Rather than the judge asking open-ended questions in order to elicit truthful answers with an opportunity to explore anything problematic, Griffin's attorney cross-examined him and, as any good cross-examiner will, got one word "yes" answers.

In *United States v. Aybar-Peguero*, this Court recently held that a reading of the indictment and a general acknowledgment of guilt are insufficient when a

defendant denies an element of the offense, especially where the offense hinges on the defendant's intent (such as the money laundering charge in *Aybar-Peguero*). 72 F.4th 478 (2d Cir. 2023). Because Griffin never clearly admitted the *mens rea* required for conspiracy,[5] the same result as occurred in *Aybar-Peguero* is warranted here.[6]

The Motion to Withdraw Hearing confirmed the deficiencies in Griffin's Plea. Testifying under oath before Judge Briccetti months after the Plea, Griffin maintained precisely the same position he expressed before Judge Reznik: that his conduct did not constitute the crimes charged. With respect to Count One, he testified that the text messages underlying the bribery charge showed nothing more than dumping, which he acknowledged, but characterized as lawful: "the text messages, they show me dumping, your Honor, okay, and I did dump. But that's – that's not a crime." (A-609:8-10). He was equally direct about the bid-rigging and bribery charges underlying both counts: "they don't show that I did bid-rigging or

---

[5] *Compare id*. at 485 ("Here, Aybar-Peguero's non-acknowledgement of intent to conceal made it incumbent on the court to ensure that the record of the plea proceeding contained evidence that the motive, and not just the effect, of Aybar-Peguero's conduct was concealment.").

[6] The Government also cites *Griffin v. United States*, 405 F.2d 1378 (D.C. Cir. 1968). (Opp. at 44). That case involved a plea entered during trial after the defendant had begun testifying in the presence of the jury, which had already heard extensive evidence, including eyewitness testimony. No comparable record exists here and such authority is inapplicable.

that I did . . . bribery. They don't show that, your Honor." (A-609:19-23). And with respect to the environmental damage forming the basis of the Government's loss calculation, he denied any culpability: "I did not fill in the wetlands, and I'm not responsible for one iota in the Westchester Land Trust. It never happened." (A-607:12-14). These are not the statements of a defendant who pleaded guilty with a genuine understanding that his conduct was criminal. They are the statements of a defendant who, at every stage of these proceedings denied possessing the criminal intent the charges required. Under *Aybar-Peguero*, that persistent denial made it incumbent on the District Court to ensure the record contained affirmative evidence of the required *mens rea*. Since the record contains no such evidence, the District Court erred by accepting Griffin's Plea.

## III. Griffin Preserved His Loss-Amount Challenge and Was Denied the Opportunity to Develop the Record

The Government also argues that Griffin waived any challenge to the $1.2 million loss amount because the parties stipulated to that figure in the Plea Agreement. (Opp. at 54). The sentencing was the direct result of the flawed plea proceedings and, as such, the foregoing arguments regarding voluntariness and Rule 11 violations are also grounds for vacating the sentence. Particularly significant with respect to sentencing, McCarthy testified that Griffin was "very angry about the money" and "passionately upset" about the loss calculation included in the Plea

Agreement; he was "adamant that those were inaccurate and improperly obtained figures." (A-474:9-10).

If this Court reverses the lower court's decision on Griffin's Motion to Withdraw his Plea, and Griffin is permitted to withdraw his Plea, the sentencing will be a nullity (notwithstanding the time he has already served). However, if the Court affirms, it should consider all of the facts and circumstances, including McCarthy's description of Griffin's state of mind and the arguments new counsel made at sentencing, and decline to give effect to the appellate waiver in the Plea Agreement with respect to Griffin's guidelines and restitution arguments.

In writing and orally at sentencing, Griffin opposed the loss figures and objected to the factual basis underlying them, yet the District Court nonetheless adopted the stipulated amount without making the particularized findings required under the Sentencing Guidelines (whether or not there is a plea agreement). In doing so, the court attributed environmental losses to Griffin that extended far beyond the scope of the conspiracy charged in Count One and ignored substantial evidence of intervening causes that could have produced the environmental harm observed years later. Sentencing based on such unsupported factual assumptions constitutes procedural error. *See United States v. DeSilva*, 613 F.3d 352, 356 (2d Cir. 2010) (procedural error includes "selecting a sentence based on clearly erroneous facts").

The Guidelines likewise caution against factual stipulations that contain "misleading facts." U.S.S.G. § 6B1.4(a)(2).

Griffin did not simply accept the stipulated loss amount. He challenged the factual basis for the $1.2 million figure before sentencing and requested a *Fatico* hearing to test the Government's calculations. (A-781 n. 45; A-1015:16-20). Despite being confronted with clear evidence demonstrating that the factual basis adopted by the Government was manifestly flawed, the District Court denied Griffin's request and adopted the stipulated loss figure. (A-1015:16-20; A-1020:4-8). The District Court erred by accepting the Government's loss amount without any further inquiry, and sentencing Griffin thereon.

### A. The Government Erroneously Presumes the Loss Amount Was Uncontested

Despite the Government's own evidence casting doubt on the propriety of the Government's loss calculation and attribution to Griffin, the Government relies upon the purportedly ironclad nature of the Plea Agreement's loss amount stipulation. (Opp. at 55). The Government relies heavily on *United States v. Glum*, 272 F. App'x 124 (2d Cir. 2008), for the proposition that the Court did not err in accepting the stipulated loss amount. (Opp. at 55). In *Glum*, however, the defendant did not object to the stipulated loss amount in the PSR or at sentencing. 272 F. App'x at 126. Nor did the defendant in *Glum* challenge the voluntariness of his plea, as Griffin does here. *Id*. The Second Circuit therefore reviewed the district court's acceptance of the

stipulation only for plain error. *Id*.

In contrast, Griffin objected to the loss calculation, disputed the scope of the losses attributed to him, and requested a *Fatico* hearing. (A-1015:16-20; A-1020:4-8). The District Court specifically stated that "[t]he loss amount with respect to Count One, which is what largely determines the applicable guideline range here, is $1.2 million." (A-1019:25-1020:1-2). However, the record reflects substantial factual disputes regarding the source and timing of the environmental harm underlying that figure. Numerous unrelated third parties deposited materials at the Arlo Lane Facility for decades, including other contractors who used the site contemporaneously with Griffin, as reflected in the Government's own video evidence. (SA-1).[7] The record further establishes that piles of materials existed at the facility both before the conspiracy began and after it ended.

In addition, Griffin and his employees did not operate the machinery used to move or manage those piles of materials at the site. Nor could it be shown that the noxious materials found at the facility could be traced to Griffin. (*See* A-724, 756, 769-70). Despite these facts, the lower court attributed millions of dollars in environmental harm to Griffin based on conditions observed for the first time years

---

[7] This Exhibit is separately provided as a CD-ROM under seal.

after the alleged conspiracy ceased.[8] Because the loss calculation was contested and implicated questions of causation and scope, the reasoning that drove the court's decision in *Glum* does not apply.

The same distinction undermines the Government's reliance on *United States v. Granik*, 386 F.3d 404 (2d Cir. 2004). The Court's holding in *Granik* firmly supports Griffin's position: that a "stipulation does not bind the sentencing court, and that court must find the loss amount as a fact at sentencing." 386 F.3d at 411. In *Granik*, the defendant withdrew his objections to the PSR and did not contest the stipulated loss amount at sentencing. *Id.* at 413-14. The Second Circuit therefore concluded there was "simply no cause" to revisit the factual stipulation. *Id*. at 414.

Here, Griffin did contest the factual findings in the PSR and the factual basis underlying the stipulated loss amount. He challenged the reliability and scope of the loss calculation – especially given that it attributed harm caused by numerous third parties to Griffin – and requested an evidentiary hearing. (A-1015:16-20). Griffin's objections focused on whether environmental damage attributed to him was actually caused by third parties or occurred years after the charged conspiracy ended.

---

[8] Google Earth satellite imagery suggests that there were always piles of various materials at the Arlo Lane Facility, which nobody disputes, and further suggests that the Arlo Lane Facility's footprint was constantly expanding over the years. (A-868-A-877).

The PSR's factual assertions concerning environmental loss were themselves derived largely from victim submissions rather than independent factual findings. *Granik* did not address issues of causation or third parties' contribution(s) to the harm because the defendant there abandoned his objections, whereas, here, from the Plea Hearing and thereafter, Griffin has always maintained his objections to the loss amount as an inaccurate measure of the harm that was directly foreseeable from his conduct. (*See* A-160:1-3 ("And what's in the dump right now is five or seven percent mine and 93 percent other people, and I got blamed for the entire thing.")).

### B. The District Court Adopted Loss Estimates Without Resolving Disputed Issues of Fact Concerning Causation

The record is clear that the lower court simply accepted the stipulated loss amount and did no independent investigation of its own. (A-1020:1-8). Griffin argued that those estimates attributed environmental harm of uncertain origin to him without individualized findings establishing causation or foreseeability, and fully disregarding the conduct of third parties, who were undisputedly frequently depositing materials at the Arlo Lane Facility. (A-1006:6-10). The record also contains substantial evidence that intervening forces may have caused or contributed to the environmental harm observed years later.

The conspiracy charged in Count One ended in September 2019. (A-1089). The WLT first observed the alleged environmental damage in August 2022, and the Town did not conduct its own testing until November 2024. (A-878). During that

intervening period, the Arlo Lane Facility continued to receive materials from other contractors and always remained under the control of Town personnel. The Government's video evidence established that Town personnel were moving materials deposited at the Arlo Lane Facility into the area directly adjacent to the abutting wetlands, without any input or involvement from Griffin. (SA-1).

Once Griffin raised those factual disputes and requested a *Fatico* hearing, the lower court had to resolve the contested issues before attributing those losses to him by sentencing him thereon. Instead, the lower court adopted the stipulated amount without resolving the factual disputes Griffin identified. Then, the lower court failed to credit or consider certain offsets, as Application Note 3(D)(i) to U.S.S.G. §2B1.1 requires. Accordingly, the lower court erred by leaving unresolved serious questions and failing to make the findings necessary to support the loss calculation, which drove the lower court's ultimate sentencing decision. Considering the environmental harm drove Griffin's sentence, a considerably lower sentence could follow if the loss were ultimately found to be a fraction of the $1.2 million.

# CONCLUSION

Because Griffin's Plea was coerced, the product of ineffective assistance, and failed to satisfy Rule 11, his conviction should be vacated. Because the District Court relied on a disputed loss amount unsupported by individualized findings, his sentence should be vacated and the case remanded.

Dated: March 30, 2026
New York, New York

**WINDELS MARX LANE & MITTENDORF, LLP**

By: /s/ *Jeffrey C. Hoffman*
Jeffrey C. Hoffman
Gabriel Altman
Marky Suazo
156 West 56th Street
New York, New York 10019
(212) 237-1000
jhoffman@windelsmarx.com
galtman@windelsmarx.com
msuazo@windelsmarx.com
*Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,951 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: New York, New York
March 30, 2026